NOS. 20-1400, 20-1401

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

_____

NO. 20-1400

UNITED STATES OF AMERICA,
APPELLANT

v.

JOSEPH BAPTISTE,
DEFENDANT-APPELLEE

_____

NO. 20-1401

UNITED STATES OF AMERICA,
APPELLANT

v.

ROGER RICHARD BONCY,
DEFENDANT-APPELLEE

_____

ON APPEAL FROM AN ORDER ENTERED IN
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

OPENING BRIEF FOR THE UNITED STATES

_____

BRIAN C. RABBITT
ACTING ASSISTANT ATTORNEY GENERAL

ROBERT A. ZINK
ACTING DEPUTY
ASSISTANT ATTORNEY GENERAL

JEREMY R. SANDERS
APPELLATE COUNSEL
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

ANDREW E. LELLING
UNITED STATES ATTORNEY

ALEXIA R. DE VINCENTIS
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY
U.S. COURTHOUSE
1 COURTHOUSE WAY, SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3394

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF JURISDICTION...................................................................... 1

STATEMENT OF THE ISSUES........................................................................... 1

STATEMENT OF THE CASE.............................................................................. 2

    A.    The Trial Evidence ................................................................................ 3

        1.    The FBI's November 13, 2014 introduction to Baptiste................................................................................ 3

        2.    The November 12, 2015 meeting between SEW and Haiti Invest ................................................................................ 5

        3.    Baptiste's and Boncy's discussions of bribe payments ................................................................................ 9

        4.    Securing funding for bribe payments....................................... 17

        5.    Baptiste and Boncy's plan to utilize their improper business advantage ................................................................. 21

        6.    The FBI's approach................................................................. 22

    B.    The Post-Trial Motions and Evidentiary Hearing.............................. 22

    C.    The District Court's Order Granting the New Trial Motions ............. 23

SUMMARY OF ARGUMENT ......................................................................... 27

ARGUMENT ...................................................................................................29

I.      Legal Framework and Standard of Review ......................................29

II.     The District Court Erred as a Matter of Law by Finding Prejudice to Baptiste Without Considering the Totality of the Evidence and Determining that Any Purported Error(s) Created a Reasonable Probability of a Different Outcome .............................................31

        A.      The Evidence of Baptiste's and Boncy's Guilt Was Overwhelming .................................................................32

        B.      Baptiste and Boncy Had Complementary Defenses ...........35

        C.      None of LaRoche's Purported Failures Affected the Trial's Outcome ...................................................................38

III.    The District Court Erred as a Matter of Law by Finding Derivative Prejudice to Boncy ...................................................................44

CONCLUSION ..............................................................................................50

CERTIFICATE OF COMPLIANCE ..................................................................51

CERTIFICATE OF SERVICE ..........................................................................52

# TABLE OF AUTHORITIES

## CASES

*Brewer v. Cunningham*,
   No. 13 Civ. 2873, 2018 WL 6705707 (S.D.N.Y. Feb. 8, 2018).......................45

*Cohen v. United States*,
   996 F. Supp. 110 (D. Mass. 1998) .................................................................38

*Dugas v. Coplan*,
   506 F.3d 1 (1st Cir. 2007) .............................................................................30

*Dugas v. Coplan*,
   428 F.3d 317 (1st Cir. 2005) ........................................................... 30, 34, 42

*Faretta v. California*,
   422 U.S. 806 (1975)......................................................................................45

*Gannett Co. v. DePasquale*,
   443 U.S. 368 (1979) .................................................................................. 44-46

*Garcia v. Lewis*,
   No. CV 13-5037-ODW (SP), 2015 WL 5461530 (C.D. Cal. June 23, 2015).45

*Harrington v. Richter*,
   562 U.S. 86 (2011) ......................................................................... 27, 30, 44

*Kubat v. Thieret*,
   867 F.2d 351 (7th Cir. 1989)........................................................................42

*Lao v. Virga*,
   No. 2:08-cv-3171-MCE TJB, 2011 WL 5101982 (E.D. Cal. Oct. 26, 2011)..45

*Stephens v. Hall*,
   294 F.3d 210 (1st Cir. 2002) ...................................................................... 30, 40

*Strickland v. Washington*,
   466 U.S. 668 (1984) ............................................................................. *passim*

*Texas v. Cobb*,
   532 U.S. 162 (2001) ......................................................................................44

iii

*Turner v. United States*,
  699 F.3d 578 (1st Cir. 2012)..................................................................30

*United States v. Arango*,
  1993 WL 482917 (10th Cir. Nov. 22, 1993)............................................. 47, 49

*United States v. Connolly*,
  504 F.3d 206 (1st Cir. 2007)..................................................................29

*United States v. Cronic*,
  466 U.S. 648 (1984)..............................................................................43

*United States v. Davis*,
  612 F. App'x 526 (10th Cir. 2015) .........................................................45

*United States v. Davis*,
  623 F.2d 188 (1st Cir. 1980) ................................................................. 46-47

*United States v. De La Cruz*,
  514 F.3d 121 (1st Cir. 2008)..................................................................29

*United States v. Floyd*,
  740 F.3d 22 (1st Cir. 2014) ...................................................................47

*United States v. Garrett*,
  961 F.2d 743 (8th Cir. 1992)..................................................................47

*United States v. Glantz*,
  810 F.2d 316 (1st Cir. 1987) ..................................................................44

*United States v. Guanti*,
  421 F.2d 792 (2d Cir. 1970)................................................................... 46, 49

*United States v. Johnson*,
  267 F.3d 376 (5th Cir. 2001)..................................................................45

*United States v. Josleyn*,
  206 F.3d 144 (1st Cir. 2000) .................................................................29

*United States v. Martinez–Molina*,
  64 F.3d 719 (1st Cir. 1995) ...................................................................38

iv

*United States v. Mohammed,*
  863 F.3d 885 (D.C. Cir. 2017) ................................................................. 30, 40

*United States v. Paradis,*
  802 F.2d 553 (1st Cir. 1986) .................................................................31

*United States v. Partin,*
  601 F.2d 1000 (9th Cir. 1979).................................................................45

*United States v. Peña–Lora,*
  225 F.3d 17 (1st Cir. 2000) .................................................................31

*United States v. Recendiz,*
  557 F.3d 511 (7th Cir. 2009).................................................................46

*United States v. Rondon,*
  204 F.3d 376 (2d Cir. 2000).................................................................46

*United States v. Sabatino,*
  943 F.2d 94 (1st Cir. 1991) ................................................................. 28, 45-46

*United States v. Sampson,*
  486 F.3d 13 (1st Cir. 2007) .................................................................43

*United States v. Sepulveda,*
  15 F.3d 1161 (1st Cir. 1993).................................................................42

*United States v. Silvia,*
  953 F.3d 139 (1st Cir. 2020) ................................................................. 29, 41

*United States v. Silvia,*
  No. CR 14-10082-GAO, 2018 WL 10704411 (D. Mass. Apr. 23, 2018) .......41

*United States v. Sims,*
  845 F.2d 1564 (11th Cir. 1988).................................................................45

*United States v. Straker,*
  800 F.3d 570 (D.C. Cir. 2015) .................................................................45

*United States v. Theodore,*
  468 F.3d 52 (1st Cir. 2006) ........................................................... 29, 39, 43

v

*United States v. Tiem Trinh*,
  665 F.3d 1 (1st Cir. 2011) ........................................................... 31, 47

*United States v. Wilkerson*,
  251 F.3d 273 (1st Cir. 2001) ...................................................... 43-44

## STATUTES AND RULES

18 U.S.C. §371 ...................................................................................2

18 U.S.C. §1952 .................................................................................2

18 U.S.C. §1956(h) ............................................................................2

18 U.S.C. §3231 .................................................................................1

18 U.S.C. §3731 .................................................................................1

Fed. R. Crim. P. 33(a) .......................................................................1

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction because the indictment charged the defendants, Joseph Baptiste and Richard Boncy, with an offense against the United States. 18 U.S.C. §3231. The district court granted the defendants' motions for a new trial pursuant to Fed. R. Crim. P. 33(a) on March 11, 2020, [G.Add.1-16],[1] and the government filed a timely notice of appeal on April 6, 2020, [G.Add.17]. This Court has jurisdiction pursuant to 18 U.S.C. §3731.

## STATEMENT OF THE ISSUES

1. Whether the district court erred as a matter of law by finding prejudice resulting from ineffective assistance of counsel without determining that any purported error or errors created a reasonable probability of a different outcome in the trial.

2. Whether the district court erred as a matter of law by granting a new trial to a defendant who had effective counsel, based on the deficient performance of a co-defendant's counsel, despite this Court's precedent rejecting an identical claim on the ground that Sixth Amendment rights are personal in nature and cannot be asserted vicariously.

---

[1] "[G.Add.__]" refers to the government's addendum, and "[JA.__]" and "[D.__]" refer to the joint appendix and a docket entry, respectively.

1

**STATEMENT OF THE CASE**

On June 20, 2019, Joseph Baptiste and Richard Boncy were found guilty by a jury of conspiring to violate the Foreign Corrupt Practices Act ("FCPA") and the Travel Act, in violation of 18 U.S.C. §371. [D.199]. The jury also found Baptiste guilty, and Boncy not guilty, of violating the Travel Act, 18 U.S.C. §1952, and of money laundering conspiracy, in violation of 18 U.S.C. §1956(h). [D.199]. The charges arose out of a Federal Bureau of Investigation ("FBI") investigation into efforts by Baptiste, a retired U.S. Army colonel and practicing dentist, to bribe officials of the Republic of Haiti with money, consulting agreements, and business interests to obtain governmental support of an infrastructure project and to use the U.S.-based charity he founded, the National Organization for the Advancement of Haitians ("NOAH"), to accept money to be used to pay bribes. At the time, Baptiste was working with Boncy, a former senior corporate executive trained in law and business management, to secure government approval to construct a shipping port in northern Haiti. Boncy served as the chairman and chief executive officer of a U.S.-based entity, Haiti Invest, LLC, which he created to pursue that and other ventures. Baptiste was a member of Haiti Invest's board of directors.

After the verdict, the defendants moved for new trials. [D.239; D.242]. The district court (Burroughs, J.) granted both defendants' motions based on the ineffective assistance of Baptiste's counsel alone, and did so without consideration

2

of the defense presented or the strength of the government's evidence—much of which consisted of highly incriminating recordings that were properly obtained and admitted at trial. This appeal followed.

### A.    The Trial Evidence

#### 1.    *The FBI's November 13, 2014 introduction to Baptiste*

On November 13, 2014, Baptiste met in Boston with Antonello "Nello" Rossi, a scout for foreign investments on behalf of SEW Funds. [JA.74-75]. Unbeknownst to Baptiste, "Nello" was an undercover FBI agent, and SEW Funds ("SEW") was a fictitious entity created by the FBI for purposes of investigating alleged FCPA violations. [JA.74-75]. Nello was introduced to Baptiste at the meeting by "Angelo," a business associate of Baptiste who was also a confidential human source ("CHS") for the FBI. [JA.76-77].

During the audio-recorded meeting, Nello told Baptiste that SEW was looking for foreign investments but was concerned with political risk. [JA.1289, 1293]. Baptiste said he had high-level contacts within the Haitian government and could cut through red tape to ensure investments in Haiti succeed. [JA.1287, 1295]. When Nello asked if it was a "pay-to-play kind of deal," Baptiste responded that "[a]s a U.S. company, we cannot do it"—but quickly added that "knowing my Haitian

(laughs) partners, that would be very easy."[2]  [JA.1299].  Baptiste explained that such "tips" could be routed through his nonprofit and paid to officials by funding their "pet project[s]."  [JA.1299-1304; *see also* JA.1308, 1311].  The "tips" would be funded as a percentage of the investment.  [JA.1304-1308].

Over the ensuing months, Nello and Baptiste exchanged occasional communications concerning a particular potential investment discussed at the November 13, 2014 meeting:  the Môle St. Nicolas Port Project proposed by Haiti Invest.  [JA.101-107].  After receiving informational prospectuses about the project, [JA.1319-1340; JA.1341-1440], Nello asked Baptiste in October 2015 for financial and permitting information needed to submit the project for SEW review.  [JA.108-109; JA.1456-1457].  The response came from Boncy, who introduced himself as the CEO of Haiti Invest.  [JA.110; JA.1455-1456].  Boncy highlighted a cement factory as the "most profitable element[]" of the Môle Project and informed Nello that Haiti Invest had been "assured officially by all the relevant Haitian authorities that all permits required will be granted speedily" and "[t]he official letters are

---

[2] The recordings introduced into evidence at trial included conversations that took place in English, Haitian Creole, and, in some cases, a combination of both.  In the case of recordings containing Haitian Creole, a translation of the Haitian Creole portion of the recording was also entered into evidence.  In the case of recordings or portions of recordings containing English, the jury was provided a transcript as a chalk.  Citations to recorded conversations are to the translation or transcript provided to the jury, although the English-language recordings are also included among the joint appendix materials.

available should you wish to verify them." [JA.1456]. The letters soon followed. [JA.1459-1466]. The first was an August 2012 letter from the then-Prime Minister of Haiti, Laurent Salvador Lamothe, who provided assurances of support from the relevant authorities "for the procurement of the licenses and authorizations required for mining and operation" of the cement project. [JA.1460]. A second letter, also from 2012, was from the director general of the government bureau responsible for regulating mining and cement projects. [JA.1459, 1466].

### 2.    *The November 12, 2015 meeting between SEW and Haiti Invest*

Following receipt of the letters, Nello told Boncy and Baptiste that he and his principal at SEW were interested in meeting in person. [JA.113-115; JA.1477]. On November 12, 2015, Nello and "Peter Anderson"—an FBI agent acting in undercover capacity as the director of foreign investment for SEW—met in a conference room at the Boston Harbor Hotel with Baptiste, Boncy, and Jean Frederic Sales, a third member of the Haiti Invest board.[3] [JA.115-117, 496; JA.1413]. During the video- and audio-recorded meeting, Anderson reiterated SEW's concern with "risk on the ground" and said he understood from Nello that Baptiste was "a real expert at mitigating that risk." [JA.1525-1526]. The official letters were important in this regard, he said, because they "show[ed] that there's access."

---

[3] Sales was an unindicted co-conspirator. [D.74 at 2; JA.1252].

[JA.1528; *see also* JA.513-514].  Baptiste assured Anderson that "access is not a problem" and agreed to his request to provide an updated letter to demonstrate that access continued.  [JA.1528-1529].  Boncy indicated that no money would need to be paid for the letter.  [JA.218, 254; JA.1563].

Asked whether it was possible to invest in Haiti without such access, Baptiste responded:

> I can be very blunt.  Uh, I know he's a lawyer, he don't want to hear it, uh, but, uh (laughs) close your ears.  In Haiti, when they—when you come in with a project, more than $100 million, people see, uh, money, they see their retirement, they see everything.  So when you come and ask them for something, they say, "What's in it for me?"

[JA.1590].  Baptiste said the Môle Project had thus far stalled precisely because they had not "put anything on the table."  [JA.1591; *see also* JA.1562-1563].  He explained that to fund what needed to be "put on the table"—which Anderson referred to as "pay-to-play expenses"—5% had been built into the project's cost as "unforeseen . . . expenses."[4]  [JA.1605-1606; *see also* JA.1604, 1615].  Sales cautioned that because money for these expenses would go through the U.S. banking

---

[4] During this conversation, Boncy stated that "we've set aside 5% of the profits of the company, OK, as you go." [JA.1561].  When Anderson then noted that "you're not making a profit during construction," Baptiste said, "But on the expense, as well, . . . [t]here is a part of the expense money—" and Boncy interjected, "The—the unforeseen part."  Baptiste echoed Boncy:  "Unforeseen, exactly." [JA.1561].

system, one had to be careful so as not to be "hit by . . . corrupt practice." [JA.1591-1592]. Boncy interjected that as someone who spent years working in compliance for large corporations, that was his "specialty." [JA.1592-1593].

The parties also discussed how and to whom payments would be made. Boncy explained that "it's more complex than cash," [JA.1596; *see also* JA.1576], and Baptiste proceeded to give examples that included both cash under the table for low-level government employees, [JA.1612-1613], and funding community development projects and otherwise "tak[ing] care of" local politicians, [JA.1609-1610]. Sales also later discussed awarding equity interests in addition to "upfront . . . side cash" to officials who were "instrumental." [JA.1571-1574]. Boncy at no point expressed disagreement; indeed, when Nello asked him about an example of a social development project Baptiste had conveyed to him at the introductory November 13, 2014 meeting—in which $100,000 would be donated for a project that cost $80,000, with the politician pocketing the difference—Boncy agreed that "[s]ometimes it's like that." [JA.1575-1576; *see also* JA.1303]. "[P]art of the problem," he explained, was that salaries for Haitian politicians are low. [JA.1576].

Baptiste and Sales assured Anderson that "[y]ou don't have to pay everybody," emphasizing that the "key people" were those with influence over the licenses, who could "instruct whatever entities have to give . . . authorization of license to move forward." [JA.1555-1558; *see also* JA.1612 ("You start a project,

7

you need . . . license, you need this, you need that . . .")]. "The main problem," Baptiste said, "is the top echelon, uh, so you can get access to this whole government." [JA.1568]. In that vein, Baptiste and Sales discussed bribing the candidates in the upcoming presidential election. They explained that the two candidates would be "hungr[y]" for money for their campaigns, and providing them both with money now would ensure access later—no matter who won. [JA.1542, 1565-1569; JA.1598-1601]. Baptiste said that "if we can raise $100,000 for each of, each one of them, then they, they'd be happy." [JA.1600]. As Boncy clarified, however, the $100,000 was "not a contribution." [JA.1600]. When Anderson asked whether the $100,000 payments would "solve all our problems down there," Baptiste agreed. [JA.1601]. Asked "What if there's a strike? What if you need access to someone?" Boncy responded: "They have access to the president." [JA.1601].

The references to bribes were equally thinly-veiled during a video- and audio-recorded side conversation between Anderson and Baptiste. During that conversation, which occurred in a private suite, Anderson again referred to "pay-to-play" and asked Baptiste, "Who has their hands out for the payments?" [JA.504-505; JA.1493]. Baptiste responded that "it start from the top down," confirming that both the president and prime minister would expect payment and that "usually, 100,000 . . . is my round figure for them." [JA.1493-1495, 1509]. Baptiste also confirmed Anderson's understanding that the money for the "payoffs" "has to be

8

there up front, before the project starts," and reiterated that 5% of project costs should be allocated to such payments.  [JA.1498, 1501-1502].  Baptiste explained that payments could be concealed as donations to NOAH, saying, "We know that we have to do things in Haiti to make things happen . . . [b]ut we make it on a way that is legal."  [JA.1498-1501, 1508-1509].

### 3.    Baptiste's and Boncy's discussions of bribe payments

The November 12, 2015 meeting ended with a request that Haiti Invest send SEW a draft contract and the updated letter of support from the current prime minister.  [JA.513-514].  Baptiste and Boncy then discussed the letter three days later, on November 15, during a call recorded by a wiretap obtained by the FBI pursuant to a Title III warrant.  [JA.720 (noting two 30-day authorizations to wiretap Baptiste's phone)].  Baptiste had already spoken about the letter with a government official working in the Prime Minister's office, Youri Emmanuel—whom Baptiste promised to "put [o]n [his] Xmas list,"—and told Boncy he would follow up when he arrived in Haiti in a few days' time.  [JA.744; JA.1639; JA.1644].  Baptiste and Boncy also discussed the upcoming election and the need to pay the candidates while they were in want of money for their campaigns.  [JA.1644-1645].  Baptiste told Boncy he would have SEW send the requisite funds as a "donation" to NOAH for "social programs" "because we cannot really make any political donation." [JA.1644-1645, 1647].  Boncy agreed and added:  "And . . . make it personal.

9

Remember that a U.S. citizen don't put, don't relate, don't relate the payment to the project." [JA.1645; *see also* JA.1647 ("Yes, yes, yes.  Send it to NOAH.")].  Boncy then told Baptiste to "do it by phone," cautioning him not to "write too much.  Avoid writing . . . ." [JA.1645].

The following day, Baptiste spoke to Anderson.  Baptiste told Anderson he expected to have the letter by the end of the week and requested that SEW provide $50,000 for the letter in the form of a donation to NOAH.  [JA.1654-1655, 1659, 1662-1666].  Baptiste told him, "[I]f you give a donation, . . . you know what the donation's gonna go for."  [JA.1657; *see also* JA.1658 ([Y]ou don't want anything tha—to say, 'OK, you tried to, uh . . .'  You (inaudible) use—use your word over the phone, but, uh, you know what I mean."), 1668 (stating that "[Y]ou and I know . . . what it's for" and agreeing with Anderson that "none of that money's going towards an orphanage or hospital or anything")].  Baptiste confirmed that he had "talked to . . . the other two partners, to make sure that they understand my wavelength," and that Boncy and Sales "don't have any problem, as long as, uh, they don't have any connection between, uh—between us a—and the contract.  Because remember, this is a US and you are US, and, uh, they're US.  That's why I'm using NOAH Haiti, so there's nothing, uh, gonna come back to us."  [JA.1654, 1667; *see also* JA.1668 ("[W]hen IRS ask you why you got the tax-deductible money for, you say, 'Well, this is, uh—this is for—to help some, uh, social program in Haiti.'")].

10

Baptiste also told Anderson that Boncy was traveling back to his home in Spain and expected to have the draft contract soon, as well. [JA.219; JA.1661-1662].

Anderson and Baptiste spoke again on November 20, 2015, when Baptiste told Anderson he was meeting that day with the current Prime Minister, Evans Paul, to secure the letter. [JA.746; JA.1676]. Baptiste informed Anderson that he planned to tell the Prime Minister that "we're going to do some . . . social program for him" and had also already promised him a spot "on our board" for when he left office. [JA.1676-1678, 1680]. When Anderson asked who else would be present at the meeting, Baptiste responded that it was a "one-on-one meeting," "[b]ecause, uh, when we're gonna talk about these type of things, I don't want other people in the room." [JA.1679-1680; *see also* JA.1681 ("[M]e and the prime minister, is a one-on-one, yeah, nobody there, no witness or anything else.")]. Baptiste expressed to Anderson that "If I promise him, I want to make sure that we deliver," and Anderson confirmed that he would wire $25,000 to NOAH for an initial payment. [JA.1676-1677, 1681-1682]. Meanwhile, Boncy sent Baptiste a copy of the cement project business plan for use during his meeting with the Prime Minister. [JA.1705-1746]. Boncy also emailed Anderson, copying Baptiste and Sales, a draft joint venture agreement that set the investment for the first phase of the cement project at $84 million. [JA.1747-1748; JA.1791-1792 ("Schedule for Financing of Phase I: USD 34 million at Closing, USD 30 million on June 1, 2016, and USD 20 million on Dec.

11

1, 2016")].[5] The draft included a callout for "Charitable Contribution," which stated that "[t]he Parties agree that [the joint venture company] shall be required to invest 5% of its annual net income for purposes of funding the Social Program established by the Parties." [JA.1792].

Anderson and Baptiste followed up later that day. Anderson confirmed that he received photographs Baptiste sent of himself with the Prime Minister at the meeting. [JA.1795-1796; JA.2106; *see also* JA.759-761; JA.903]. Baptiste, for his part, confirmed that he received the initial $25,000 from Anderson and had shown the Prime Minister that half of the payment was already there. [JA.1803; *see also* JA.754-755 (confirming wire transfer to NOAH account); JA.1905-1908 (Dec. 4, 2015 email attaching letter from NOAH acknowledging contribution from SEW)]. He told Anderson the Prime Minister wanted the entire payment all at once, though assured Anderson that the additional $25,000 would "secure all the access we need." [JA.1804, 1810]. Baptiste explained that if he was already back in the United States by the time the additional funds became available, his brother, Alix Baptiste, "understands how this works" and would handle making the payment in Haiti in his

---

[5] These documents refer to Hispaniola Invest, to which Haiti Invest had changed its name. [JA.1062].

stead.[6] [JA.1805-1807; *see also, e.g.*, JA.1487-1488 (Nov. 12, 2015 call between Joseph and Alix Baptiste discussing payments to "grease the paws"); JA.1828 (Nov. 24, 2015 call discussing need for SEW funds "to invest because the second turn of elections is in the corner"); JA.1846 (Nov. 25, 2015 call discussing opening of NOAH account in Haiti); JA.1932-1936 (Dec. 10, 2015 call discussing creation of a second, Haiti-based NOAH entity to manage consultancies being offered in exchange for support); JA.2055-2062 (Dec. 18, 2015 emails with wiring instructions for new account)]. That payment, Baptiste explained, would be "probably cash" because the Prime Minister "don't want anything traceable." [JA.1804]. Baptiste also conveyed that the Prime Minister agreed with the plan to "support[]" both presidential candidates "to make sure that . . . whomever's going to be there, we have a seat at the table." [JA.1809]. When Anderson inquired whether there was anyone else to "pay off," Baptiste said he planned to speak with the Minister of Finance but was not yet sure. [JA.1812].

Over the coming weeks, Baptiste and Boncy worked out the details of the scheme. On November 21, 2015, Baptiste told Boncy that he had promised the Prime Minister a job as a consultant after he left government service, a plan with which Boncy agreed. [JA.1821; *see also* JA.1854 (Nov. 27, 2015 call in which

---

[6] Alix Baptiste, like Sales, was an unindicted co-conspirator. [D.74 at 2; JA.1252].

13

Baptiste told Boncy that "after I talked to the Prime Minister, he agreed to be on the, when he agreed to be on the board, he understood what that meant")]. Baptiste said the same arrangement could be offered to the Minister of Finance, Wilson Laleau, to ensure his support, as well. [JA.553; JA.1817-1818; *see also* JA.1822 ("Either the Prime Minister, or Laleau, we will deal, we will deal with them . . . .")]. Baptiste expressed that the letter memorializing the Prime Minister's support was "just to show that we have access" and "not a big deal," but Boncy told Baptiste he "must take the letter." [JA.1816, 1822]. Baptiste told Boncy that in order do so, "we have to come up with something . . . . Between you and I, we put something out to get the letter."[7] [JA.1822; *see also* JA.905-906 (noting that photographs sent by Baptiste to Anderson of U.S. currency were taken on the date of this call)]. Boncy responded, "Ok, magnificent!" [JA.1820-1821]. The two then spoke on November 24 with Axan Abellard, an aide to the Prime Minister, to whom they explained that the cement plant for which they were seeking the letter of support had originally been part of the broader Môle Project but was separated when Laleau did not authorize the requisite Môle land lease. [JA.781; JA.1830-1831; *see also* JA.1849-1852 (Nov. 25, 2015 letter from Boncy to the Prime Minister, sent via email to Abellard, explaining that the Môle Project required a "long-term concession from the Haitian

---

[7] A translator testified that the literal translation "put something out" is colloquially understood to mean "pay some money." [JA.424].

14

Government for over 1400 hectares of land on the Môle Peninsula" and expressing hope that "provid[ing] cement for the construction of different elements of the Môle project" would lead to the "necessary permits for the other elements of the Môle project"); JA.2115 (Jan. 19, 2015 email noting that the Ministry of Finance oversaw such leases); JA.1445-1446 (Feb. 12, 2015 conversation between Baptiste and the CHS in which Baptiste described the need for a "down payment" to Laleau to get the Môle Project "back on track")].    When Baptiste asked Boncy the next day whether he could tell Abellard that "if he also gives us something for the Môle, I will give him something," Boncy responded, "Yes naturally."  [JA.1838].   Boncy once again cautioned, however, "Do not, do not write it.  Do not write it."  [JA.1838].

True to his word that "it will be by mouth," [JA.1838], Baptiste told Abellard by phone that same day that "[i]f you could give us an OK for the Môle as well, you would be involved in it."  [JA.1842].  Baptiste said he and Boncy had agreed that "it would be good if you could join us so you can push the Project forward."  [JA.1843]. He also said, "I say the same thing to the PM.  He is going to be my Consultant." [JA.1843].  When the letter had not yet been received by December 2, Baptiste told Abellard that people were waiting for it, "[s]o if we have it, you will have a good Christmas."  [JA.1863].  Baptiste updated Boncy at every step.  [JA.1854 (Nov. 27, 2015 call in which Boncy again agreed when Baptiste said that "if I talk to Axan and promise him that we are going to get him something I think that he is gonna move");

15

JA.1858 (Dec. 1, 2015 call in which Baptiste confirmed to Boncy that he "told [Abellard] if he can do something for us [a]bout Môle Saint Nicolas, we will get him involved in it"); JA.1866 (Dec. 3, 2015 call in which Baptiste conveyed to Boncy that he "told [Abellard], once we have the letter, we will take care of everyone")].

Haiti Invest received the letter of support from the Prime Minister on December 4 and forwarded it to SEW on December 9. [JA.1937-1942]. As hoped, the letter expressed support not only for the cement project but also for the Môle Project as a whole, and on December 12, Baptiste and Boncy discussed next steps for getting both projects off the ground. [JA.1949-1950]. Specifically, they discussed paying $10 million to the Minister of Finance to secure the lease for the Môle land, [JA.1949-1950, 1954; *see also* JA.1859 (in which Boncy stated, "[O]ur good brother Laleau [laughing] we have to get him involved, you know it can be blocked again," and Baptiste responded, "Laleau is going to tell me who he would like, he would like uhh under what name uhh he is not going to put it directly under Laleau's name, he will give me the one who's going to do it.")], and hiring the Prime Minister and other "go-to people" as consultants "to get this license," [JA.1955 ("Any license, anything that we need, we will hire them as consultants to get this license.")]. Baptiste was explicit that the planned payments would give the Môle Project an improper advantage. [JA.1954 ("[W]e have a better way to negotiate . . .

16

than the others.")].  Boncy, in a familiar refrain, cautioned Baptiste not to "write it." [JA.1955].

### 4.    Securing funding for bribe payments

What remained was to finalize when SEW would make the funds available for these expenses.[8]  At a December 16, 2015 meeting between Anderson and Baptiste in New York, Anderson sought clarification about the line item in the draft joint venture agreement for a charitable contribution of 5% of net income.  [JA.1963, 1965].  Baptiste explained that it was "5 percent of the total cost," which "[w]e call . . . social program . . . [b]ut you and I know what it's for," and then went on to refer to "put[ting] something on the table" for the Prime Minister, funding community development projects for the mayor, paying "Christmas bonus cash," and making people consultants.  [JA.1965-1966, 1969-1970].  The term "social program," he

---

[8] By this time, SEW had wired NOAH another $25,000 based on Baptiste's representation to Anderson that he could give the Prime Minister a consultancy position but had already paid the initial $25,000 in bribes to individuals below him and needed the additional funds to complete the deal.  [JA.556-557; JA.1874-1884, 1875-1877; *see also* JA.1889 ("[W]ith Christmas coming in and so on, they want— they want the money"); JA.1914 ("[E]verybody has to have a Christmas card."), 1917 ("[W]e call it bonuses, . . . the Christmas bonus or whatever . . . because these guys are very sensitive, and you don't want to really make it like, uh, they're getting bribes."); JA.2103 (Dec. 8, 2015 text messages from Baptiste to Anderson writing "Xmas presents" and picturing piles of U.S. currency on table)].  In actuality, much of this money was used for Baptiste's personal expenses, although at least some was used to fund November and December trips to Haiti during which he met with the Prime Minister.  [*E.g.*, JA.555-556; JA.799-803; JA.898, 1010-1011, 1026-1034].

explained, was to "cover our back" because both SEW and NOAH were prohibited by law from paying bribes. [JA.1967-1968]. Anderson asked when the 5% would need to be paid, and Baptiste said he needed to "have something up front to work with" but had to think about just how much. [JA.1973-1974]. Whether the payments would continue once the project was off the ground remained to be determined; the key for now, Baptiste said, was "to make sure that . . . we have enough to get smooth sailing." [JA.1978-1981, 1983].

Ahead of a meeting scheduled with SEW to finalize the contract in late December, the Haiti Invest team took a fresh look at the project financials. [*See* JA.2035-2054]. On December 18, Boncy sent Batiste and Sales a draft email to Anderson explaining that the previous estimate of $84 million for the first phase of the project had been based on a former potential investor's estimates of "its own bare costs" and "did not include additional costs such as the ones related to the role you anticipate[] for Joe Baptiste in advocating the project's interests with the local authorities." [JA.2012]. The revised bare cost estimate was $110 million, to which Boncy proposed adding an additional 5% for Baptiste's role. [JA.2012, 2028]. When Baptiste conveyed in response that he "would not mention increasing the total estimate by an additional 5%" because "this cost should already be in," Boncy said it unfortunately was not. [JA.2031]. Boncy suggested trying to secure the additional funds in May ahead of the second installment payment, but Baptiste said he needed

18

the 5% at the time of contract signing because "[t]he people who have help make this contract possible will not wait." [JA.2033]. Concerned, however, with scaring Anderson off, they agreed to omit mention of the 5% and simply cite "unforeseen expenses" once the project was underway. [JA.2003-2006; JA.2007-2010]. The email ultimately sent to Anderson reflected this agreement. [*See* JA.2044-2052].

On December 19, Anderson reached out to Boncy to discuss the updated proposal. [JA.574-575]. The recordings of the resulting 11- and 29-minute calls were unavailable at trial,[9] [JA.458], but Anderson said on a call with Baptiste the following day that he had spoken to Boncy and Boncy "gave me a different answer about what the 5 percent for social programs is for, than when you and I talked. And I don't know who to believe." [JA.2093. *But see* JA.2149 (Dec. 20, 2015 email in which Boncy recounts the call to Baptiste and Sales and states that, "As to the five percent Finder's fees, we are looking for a solution but I chose not to raise it with him.")]. Baptiste confirmed the money was for bribes—though noted that "we don't talk that way." [JA.2094]. He explained that "Richard [Boncy] and uh, the two

---

[9] A supervisory special agent in the FBI's operational technology division testified that at the time of these recordings, calls made by undercover agents on the FBI's consensual recording system were centrally stored for 30 days and then transferred to a local field office computer. [JA.440-441]. These recordings were irretrievably lost when they were deleted from the central system pursuant to that policy after 30 days and the local field office computer malfunctioned. [JA.442-444; JA.1065-1067].

lawyers want to insulate—uh, uh, i-insulate themself into that kind of thing, because of the ramifications of, uh—of, uh, US law, when you do that stuff," and that he, too, had to be careful. [JA.2096-2097]. Consistent with that explanation, Boncy sent Baptiste and Sales an email on the evening of his call with Anderson, in which he noted the legal prohibition on bribes and wrote, "We live in an environment where all communications (including calls) are being recorded and often monitored by the US enforcement authorities" and "we need to keep in mind that any loose wording can be misconstrued." [JA.2147; JA.525; *see also* JA.2149 (Dec. 20, 2015 email from the same chain in which Boncy stated, "'Big Brother' is monitoring Haiti more seriously lately. . . . The application of the FCPA is getting even stricter."); JA.2066-2067, 2072 (Dec. 20, 2015 call between Boncy and Baptiste in which Boncy said a friend in the CIA informed him that the CIA is "watching especially what's going on in Haiti" and Boncy and Baptiste agreed that "we don't have to talk on the phone. . . . Protect, protect, protection . . .")]. When discussing the updated proposal elsewhere in the email, Boncy referenced the absence of "finder's fees" and indicated his understanding that "Joe has made a commitment to his associates in that regard and requires the funds at signature." [JA.2146-2147]. He had previously used the term "finder's fees"—in quotation marks—to describe the funds for Baptiste's "advocacy" with government officials. [JA.2031 ("[W]e used the numbers calculated by [the former potential investor] which obviously did not

20

include any such 'finder's fees' . . . .")].  Boncy explained that "[u]nless SEW comes up with the money in bulk payment, . . . we anticipate that the only way to pay the 5% is as a percentage of each payment received from SEW."  [JA.2147].

> 5.    *Baptiste and Boncy's plan to utilize their improper business advantage*

By December 22, SEW had conveyed to Haiti Invest that it needed more time to review the proposal in light of the new financials.  [JA.2126; *see also* JA.2089-2090, 2100].  Baptiste and Boncy discussed continuing talks with an alternative potential investor while also offering SEW the chance to make a $5 million deposit to "reserve the opportunity."  [JA.2125].  Whether SEW did so or not, however, Boncy proposed moving quickly to secure permits needed for the cement project before the upcoming change in Haiti's government. [JA.2125-2126].  Those permits included:  (1) a port permit, (2) a heavy fuel oil import permit, and (3) a mining permit.  [JA.2125].  Baptiste wrote that he was unaware they "did not have all our permits except the land issue" but would "make the necessary calls to have them approved by the PM before he leaves office."  [JA.2125].  The "PM," or Prime Minister, was Evans Paul—to whom Baptiste had offered a consultancy position in exchange for support, and to whose aide, Axan Abellard, he offered both a consultancy and cash.

### 6. The FBI's approach

On December 29, while Baptiste met with Anderson in a hotel room in Miami, Florida, Special Agents Garrett Trombly and Allison Paully knocked on the door and identified themselves as FBI. [JA.581-582; JA.896-897]. During the interview that followed, Baptiste admitted that he offered Emmanuel cash and Abellard a job on the Môle Project in exchange for their help getting the letter of support from the Prime Minister's office. [JA.899]. He said that to advance a project in Haiti, one had to pay bribes. [JA.1012].

### B.   The Post-Trial Motions and Evidentiary Hearing

Following trial, Baptiste retained new counsel and filed motions for acquittal and a new trial based on ineffective assistance of his trial counsel, [D.232, 234], and Boncy filed a motion for acquittal or, in the alternative, a new trial based on the failure to sever and the ineffectiveness of Baptiste's trial counsel—not that of his own, [D.242].

In his motion for a new trial, Baptiste argued that his trial counsel was ineffective in nine different ways, and that these deficiencies were individually and cumulatively prejudicial: (1) failing to conduct an adequate investigation; (2) failing to review critical discovery; (3) failing to consult potential experts; (4) misunderstanding the district court's pretrial rulings concerning the prosecution's evidence; (5) conducting self-defeating cross-examination or no cross-

22

examination; (6) failing to object to improper lay opinion testimony; (7) failing to move for a severance; (8) failing to request appropriate jury instructions; and (9) failing to present any coherent defense. [D.239]. In his motion, Boncy argued, in relevant part, that his and Baptiste's defenses were antagonistic. [D.242]. He further argued that although his own attorney was highly effective, any prejudice to Baptiste "necessarily" prejudiced him, as well. [D.242]. Other than to state in his reply that he was "essentially required to cross examine many of the government's witnesses and take a larger role than anticipated," [D.254 at 10], Boncy's argument was not more specific as to how he was prejudiced.

The district court held an evidentiary hearing on the motions. [D.278; D.285]. Donald LaRoche, Baptiste's trial counsel, testified on January 14, 2020. [D.278]. Attorneys Jason and Arielle Hinton, friends of Baptiste who assisted LaRoche before and during trial, testified on February 5, 2020. [D.285]. The district court did not receive evidence or testimony from Baptiste, Boncy, or Boncy's counsel.

## C.    The District Court's Order Granting the New Trial Motions

The district court granted both defendants' motions for new trials. [G.Add.16]. The court reaffirmed its earlier conclusion that the defendants were not entitled to severance because their defenses were not antagonistic. [*See* G.Add.15; *see also* JA.308-311 (noting that insofar as both defenses focused on the absence of an agreement to engage in bribery, severance was unwarranted)]. The court

23

concluded that a new trial was nonetheless warranted for both defendants, however, based on the ineffective assistance of Baptiste's counsel.

The district court began by reviewing Baptiste's counsel's performance. The court found that counsel may not have reviewed all the discovery and did not investigate adequately, interview potential witnesses, or retain experts on Haitian law or business practices, resulting in an inability to diligently defend his client at trial. [G.Add.7-10]. In reaching that conclusion, the court focused on the facts that LaRoche: admitted he had not been able to access some discovery until shortly before trial and could not state with certainty that he ever reviewed all of the audio and video recordings, [G.Add.7-8]; admitted that he did not investigate sufficiently to understand the import of the photographs of cash taken from Baptiste's phone prior to the government's use of the evidence at trial, [G.Add.8]; did not have translations or transcripts made of certain phone call recordings of conversations in Haitian Creole (in which LaRoche is fluent) or review the call recordings with Baptiste, [G.Add.9]; did not subpoena fact or expert witnesses to support a defense case, [G.Add.9]; pursued a "back-door" entrapment defense in his opening statement and relied on Hinton to draft his closing, [G.Add.9-10; JA.2611]; and decided to cross-examine only two of six witnesses during the trial and to rely instead on the cross-examinations by Boncy's attorney, "despite the fact that an aspect of [Boncy's] trial strategy was to portray Defendant Baptiste as the primary driver of the alleged

24

conspiracy," [G.Add.10]. The court concluded that these "errors, omissions, and general lack of diligence" amounted to constitutionally deficient performance. [G.Add.10-11]. The court noted that its conclusion was reinforced by its observations during trial. [G.Add.11].

The district court next found that while certain of LaRoche's deficiencies "may not have been prejudicial in isolation," their cumulative effect "raise[d] a 'reasonable probability'" that Baptiste was prejudiced. [G.Add.13 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984))]. The district court did not identify any particular evidence, witness, or issue that could have affected the outcome of the case. Instead, the court speculated that if LaRoche had prepared more diligently, he might have been more successful in crafting an overall defense. [G.Add.13]. The court wrote:

> For example, by failing to review the discovery provided by the Government—in the form of documents, audio and video recordings, and transcripts of those recordings—prior to trial, LaRoche potentially failed to identify exculpatory material or material that would have supported any potential defenses. Reviewing these materials ahead of trial would also have assisted LaRoche by informing him as to the Government's strongest evidence against his client, allowing him to prepare to discuss the evidence at trial. Further, if he had identified or interviewed potential witnesses or interviewed the Government's witnesses, or if he had identified and retained experts to testify to Haitian law or business practices, he might have presented a colorable defense for his client. Such a defense would include effective cross-examination of the Government's witnesses. Lastly, had LaRoche hired a translator to

25

> translate the audio and video recordings that were so central to the Government's case, he might have been able to challenge any potential mistranslations or words capable of multiple meanings in either English or Haitian.

[G.Add.13]. Notably, the court did not examine LaRoche's shortcomings in light of Boncy's consistent defense that there was no meeting of the minds sufficient to prove a criminal conspiracy. Nor did the court address the strength and volume of the government's evidence against Baptiste.

The district court then concluded that Boncy was vicariously prejudiced by LaRoche's ineffective representation. [G.Add.14]. Specifically, the district court found that Boncy's trial strategy was "distorted" because his attorney had to play an "outsized role at trial rather than pursue his preferred defense strategy for his own client." [G.Add.14-15]. The district court did not cite, and the record did not include, any evidence of what the supposed preferred strategy was. Rather, the court surmised that if LaRoche had been more competent, Boncy's attorney "might well have decided to say and do considerably less during trial to emphasize his client's more minor participation in the alleged conspiracy" and "might have been able to more fully develop" the lack-of-agreement defense he did pursue. [G.Add.14]. As with Baptiste, the district court did not examine the defense Boncy presented or address the strength and volume of the evidence against him when finding prejudice. The court also did not cite any case law supporting the notion of vicarious prejudice from the ineffective assistance of a co-defendant's counsel.

26

**SUMMARY OF ARGUMENT**

Without proof of both deficient performance and prejudice to the defendant, "it cannot be said that [a] conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687. And yet, in granting Baptiste's motion for a new trial, the district court effectively reached that conclusion based on deficient performance alone. The court did not identify any specific materials, witnesses, or avenues for cross-examination that would have undermined confidence in the jury's verdict if only they had been presented at trial. Instead, the court considered only the theoretical possibility that Baptiste's defense might have been more "colorable" had his counsel been better prepared. To satisfy *Strickland*'s prejudice standard, however, "[t]he likelihood of a different result [but for counsel's deficiencies] must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). The case against Baptiste was overwhelming, and nothing in LaRoche's performance could reasonably have affected the jury's understanding of key evidence of guilt.

The district court also erred in ruling that Boncy was prejudiced by Baptiste's counsel's deficiencies. In addition to failing to undertake a proper analysis of prejudice as it related to Boncy, the district court, and Boncy, failed to identify a single case where a court granted a defendant relief on the basis of the ineffective assistance of another defendant's counsel. And in fact, this Court has expressly

27

considered and rejected such a claim on the ground that the Sixth Amendment right to counsel is "personal in nature and cannot be asserted vicariously." *United States v. Sabatino*, 943 F.2d 94, 96 n.1 (1st Cir. 1991). The district court therefore erred by even entertaining Boncy's claim of vicarious ineffective assistance. Moreover, the claim would fail even if construed as an argument that Boncy was prejudiced by joinder of the trials due to the presentation of conflicting defense strategies. Indeed, the district court previously determined that Boncy's and Baptiste's defenses were not irreconcilable, and, even after granting the defendants' respective motions for a new trial, the court held that they should be retried together.

The district court's failure to properly apply *Strickland*'s prejudice standard requires reversal.

28

# ARGUMENT

## I.   Legal Framework and Standard of Review.

Although the decision to grant a new trial is ultimately reviewed for abuse of discretion, "a district court abuses its discretion whenever it predicates its ruling on an erroneous view of the law, and abstract questions of law engender de novo review." *United States v. Connolly*, 504 F.3d 206, 211-12 (1st Cir. 2007) (internal citations omitted).  "A claim that the district court applied an incorrect standard falls within this purview." *Id.* at 212; *accord United States v. Theodore*, 468 F.3d 52, 56 (1st Cir. 2006) ("Where . . . a party claims that the wrong legal standard was applied in adjudicating the motion [for a new trial], we review the claim de novo." (citing *United States v. Josleyn*, 206 F.3d 144, 151 (1st Cir. 2000)).

To order a new trial based on ineffective assistance of counsel, a district court must find both that counsel's performance was objectively unreasonable and that counsel's purported errors prejudiced the defendant.  *E.g.*, *United States v. Silvia*, 953 F.3d 139, 142 (1st Cir. 2020).  To find prejudice, the district court must conclude that there exists "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. De La Cruz*, 514 F.3d 121, 140 (1st Cir. 2008) (citing *Strickland*, 466 U.S. at 694).  A finding of prejudice cannot rest on the mere conceivability of a different outcome, because "[v]irtually every act or omission of counsel would meet that test, and not

29

every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Strickland*, 466 U.S. at 693; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable"). In evaluating prejudice, the district court must consider "the totality of the evidence" received by the jury. *Strickland*, 466 U.S. at 695; *Stephens v. Hall*, 294 F.3d 210, 218 (1st Cir. 2002).

Specifically, if a defendant asserts ineffective assistance based on counsel's failure to introduce evidence or challenge the credibility of government witnesses on cross-examination, the district court must consider three factors when evaluating prejudice: "'first, the strength of the prosecution's case; second, the effectiveness of the defense that was presented at trial; third, the potential value of the new evidence and new avenues for cross-examination in undermining the credibility of the government witnesses' testimony.'" *Turner v. United States*, 699 F.3d 578, 584 (1st Cir. 2012) (quoting *Dugas v. Coplan*, 506 F.3d 1, 9 (1st Cir. 2007)). An assertion of ineffective assistance based on a failure to investigate demands a similar analysis. *See, e.g.*, *Dugas v. Coplan*, 428 F.3d 317, 333-41 (1st Cir. 2005) (weighing potential cross-examination value of consultation with expert in light of the defense presented at trial and the strength of the evidence); *United States v. Mohammed*, 863 F.3d 885, 892 (D.C. Cir. 2017) (similar, with respect to failure to investigate).

30

A district court's decision to grant or deny severance is reviewed for "manifest abuse of discretion which deprived appellant of a fair trial and resulted in a miscarriage of justice." *United States v. Peña–Lora*, 225 F.3d 17, 33 (1st Cir. 2000). "The hurdle is intentionally high," particularly in conspiracy cases, where severance "is especially disfavored" and a defendant "can ordinarily succeed in obtaining one only by making a strong showing of evident prejudice." *Id.* (quotation marks and citation omitted). To obtain a severance based on antagonistic defenses, "'a defendant has to demonstrate that the defenses are so irreconcilable as to involve fundamental disagreement over core and basic facts.'" *United States v. Tiem Trinh*, 665 F.3d 1, 18 (1st Cir. 2011) (quoting *United States v. Paradis*, 802 F.2d 553, 561 (1st Cir. 1986)) (emphasis omitted).

## II. The District Court Erred as a Matter of Law by Finding Prejudice to Baptiste Without Considering the Totality of the Evidence and Determining that Any Purported Error(s) Created a Reasonable Probability of a Different Outcome.

In evaluating prejudice based on a claim of ineffective assistance of counsel, a court must consider the strength of the evidence, the effectiveness of the defense presented, and the value of the evidence or cross-examination inquiries foregone. The district court here considered none of those things. The court did not discuss the strength of the government's evidence, which was overwhelming. The court did not take into account the defense presented by Boncy's counsel, which was skillfully presented and complementary to Baptiste's own. And, the court did not identify

31

concrete examples of evidence or cross-examination inquiries that would have created a reasonable probability of a different outcome, of which there were none. Though the court acknowledged the "reasonable probability" standard, its finding of prejudice rested on nothing more than the unadorned conclusion that LaRoche might have presented a colorable defense if he had been better prepared. Application of the proper *Strickland* analysis compels the conclusion that LaRoche's deficiencies did not affect the verdict.[10]

### A.    The Evidence of Baptiste's and Boncy's Guilt Was Overwhelming.

The evidence of Baptiste's and Boncy's guilt was overwhelming—and nearly all of it came from their own words. In call after recorded call, the defendants agreed to bribe Haitian officials with money and consulting agreements to obtain whatever was needed to advance the cement plant and Môle Project, including, at least, letters of support to reassure investors, licenses, the lease on the land at Môle St. Nicolas, and assistance removing bureaucratic roadblocks. The district court nowhere addressed the weight of this evidence, and in failing to doing so it erred as a matter of law.

The evidence concerning Axan Abellard was emblematic of the defendants' agreement: Baptiste told Boncy that they needed to "put something out" to secure

---

[10] For purposes of this appeal, the government does not challenge the district court's ruling on deficient performance.

the letter of support from the Prime Minister, [JA.1821]; the two expressly agreed "give . . . something" to the Prime Minister's aide to help secure a letter that included support for the Môle Project, [JA.1838; JA.1853]; and Baptiste then called Abellard and actually offered him a consulting agreement, [JA.1842; *see also* JA.1858; JA.1866]. The defendants' plan did not, however, stop there. Baptiste and Boncy were also recorded agreeing to pay $100,000 to each of the two presidential candidates, [JA.1644-1645], to offer a consulting position to the Prime Minister, [JA.1821; JA.1854], and to pay $10 million to the Minister of Finance, [JA.1949-1950, 1954; *see also* JA.1859]. Both defendants were familiar with the FCPA and knew better than to call these payments what they were. [*See, e.g.*, JA.1299; JA.1592-1593; JA.2149-2153]. But the November 12, 2015 meeting at which Baptiste, Boncy, and Sales discussed to whom and how they would allocate what Anderson referred to as "pay-to-play" expenses left little doubt as to the payments' true nature. [*See* JA.1515-1576; JA.1579-1638]. And indeed, Boncy's repeated admonishment—and Baptiste's agreement—that they should not create a written record was strong evidence of consciousness of guilt. [JA.1645; JA.1838; JA.1955; *see also* JA.2095 ("[W]e don't talk that way."); JA.2072 ("[W]e don't have to talk on the phone.")]. In Baptiste's case, this already-compelling evidence was further reinforced by the recordings of his conversations with his brother, Alix Baptiste. [*E.g.*, JA.1487-1488; JA.1828; JA.1932-1936].

33

The evidence supporting Baptiste's convictions for violating the Travel Act and conspiring to commit money laundering was no less compelling. That evidence showed that Baptiste twice traveled to Haiti and repeatedly used phone and email to further the bribery scheme. [*E.g.*, JA.1011; JA.1838; JA.1842; JA.1861-1864]. It also showed that he agreed with (at least) Alix Baptiste to route bribe money through NOAH, discussing not only the concealment of bribe money as charitable contributions to the non-profit but also the creation of a second NOAH entity to manage the consultancies also being offered as bribes. [JA.1932-1936]. Moreover, while proof of an overt act was not required to support the money laundering conspiracy conviction, *see Whitfield v. United States*, 543 U.S. 209, 214 (2005), it was readily supplied by Baptiste's opening of a Haiti-based NOAH bank account and his actual receipt of $50,000 of intended bribe money disguised as a charitable contribution and used in part to promote the scheme. [JA.556-557; JA.754-755; JA.1846; JA.1905-1908; JA.2055-2062].

As the government argued below, "[t]his evidence was properly admissible, not susceptible to impeachment by anyone, and devastating proof of Baptiste's guilt." [D.251 at 7]. The threshold for prejudice is therefore comparatively high, *see Dugas*, 428 F.3d at 336 ("'[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming

34

record support.'" (quoting *Strickland*, 466 U.S. at 696))—and as set forth below, that

threshold has not been met here.

### B.    Baptiste and Boncy Had Complementary Defenses.

The district court also erred by failing to consider LaRoche's deficiencies in

light of Boncy's complementary defense.  Boncy's counsel took the lead on cross-

examining witnesses and, through his skilled questioning, advanced an argument

that there was no conspiratorial agreement.[11]   He elicited testimony that, for

example,

- there was only one meeting with the FBI at which Boncy was present, and it did not include the side conversation between Anderson and Baptiste [JA.57-59 (opening); JA.253-254 (cross-examination of FBI Special Agent Ornello Artlati ("Nello Rossi")); JA.584, 640-641 (cross-examination of FBI Special Agent Peter[12] ("Peter Anderson"))];
- at that November 2015 meeting, the defendants indicated that no payment was necessary to obtain the letter of support from the Prime Minister, and the letter was in any event not a requirement for the project, [JA.58, 61 (opening); JA.160, 163-164, 170-171, 214-216, 254-255 (Arlati cross); JA.589 (Peter cross); JA.907-908 (cross-examination of FBI Special Agent Trombly (case agent))];

---

[11] Boncy's defense also contained elements of entrapment.  Boncy's counsel highlighted that it was the FBI who reached out to Baptiste in 2015 for updates on the Môle Project, [JA.199], and "thr[ew] the red meat on the table" by offering the possibility of funding, [JA.356; *see also* JA.210-211].

[12] The agent testified using his first name only.  [JA.489-490].

- the defendants also indicated at that meeting that no payments were needed to obtain permitting, [JA.218-219, 254-255 (Arlati cross)];
- at both that meeting and in the draft joint venture agreement sent to SEW the following week, Boncy described the 5% as coming out of net profits, suggesting it was not intended for bribes because bribe money would be needed up-front, [JA.60-62 (opening); JA.237-239 (Arlati cross); JA.601, 604-605 (Peter cross); JA.972-978 (Trombly cross)];
- the only two calls between the FBI and Boncy were unavailable at trial, and Anderson's conversation with Baptiste following those calls indicated that Boncy had conveyed an understanding of the 5% that differed from Baptiste's, [JA.63-64 (opening); JA.343 (Arlati re-cross); JA.584-585, 604-607, 614-618, 639-640 (Peter cross); JA.955-962 (Trombly cross)];
- both Boncy and Alix Baptiste were unaware of the $50,000 sent to Joseph Baptiste, who was facing a difficult financial situation that included a $200,000 tax debt, offered changing explanations to SEW for the how the funds would be used, and in fact used them largely for personal expenses, [JA.586-590, 607-610 (Peter cross); JA.709 (Peter re-cross); JA.908-910, 944-945 (Trombly cross); JA.1026-1034 (defense witness Susan Howell)]; and,
- at one point the FBI investigated whether Baptiste was involved in a scheme to defraud SEW rather than to pay bribes, [JA.940-944 (Trombly cross)].

From this evidence, Boncy urged the jury to conclude that Baptiste was involved in a solitary scheme to defraud the FBI—not a conspiracy with Boncy to violate the FCPA. [JA.1212 (Boncy's counsel arguing in closing that Baptiste was actually "involved in a scheme to defraud the FBI in December of 2015"), 1214 ("That is why this evidence about the wire fraud, about the stolen $50,000 is important in this

36

case, . . . because it shows that there was no agreement between the folks who were involved.")].

Despite the district court's suggestion to the contrary, this strategy was consistent with Baptiste's own.  In fact, LaRoche embraced this strategy in an effort to account for his client's receipt of the $50,000.  [JA.1174 (closing statement in which LaRoche argued that "part of the reason Dr. Baptiste told no one about the $50,000 is because he didn't want to share it with anyone.  He also told no one about the $50,000, including the Haitian government officials, because he had no intention of giving them that money either."), 1176-1177 (arguing that Baptiste, who "admittedly was broke," "lie[d] about the intentions to use the $50,000 for a bribe" and "outmaneuvered SEW, the FBI"); *see also, e.g.*, JA.2611, 2631-2632 (evidentiary hearing at which LaRoche identified a lack of agreement as a component of his defense of Baptiste)].  The point was not "to portray Baptiste as the primary driver of the alleged conspiracy," [G.Add.10], but rather to convey Baptiste as the driver of a separate—and uncharged—scheme to defraud.  [*See* JA.314 (THE COURT:  I don't see Mr. Dwyer [Boncy's counsel] wanting to prove that there's been a conspiracy that he wasn't a part of.  MR. DWYER:  No.  It's entirely different than that.  I think there are arguments against a conspiracy, to the extent there was one, was to take advantage of the guy's offer which is, hey, you want some money.")].  As the district court recognized when denying Boncy's

motion to sever, "that doesn't put us in a place where either one has committed a violation of the FCPA." [JA.311; *see also* JA.312 ("No one is saying an [FCPA] offense was committed and it was not committed by me but it was committed by my co-defendant.")]. Rather, the defense inured to the benefit of Boncy and Baptiste alike.

Ultimately, however, that defense was insufficient to overcome the weight of the government's evidence. Boncy's counsel's thorough and skillful cross-examination of the government's witnesses to advance an argument that there was no agreement to violate the FCPA, and the jury's conviction of Boncy for conspiracy despite the assistance of skillful counsel, is strong evidence that Baptiste was not prejudiced by LaRoche's deficiencies. *See Cohen v. United States*, 996 F. Supp. 110, 116 (D. Mass. 1998) ("Ineffective assistance of counsel claims for failure adequately to cross-examine are 'utterly untenable' when a witness has been extensively and thoroughly cross-examined by the defense counsel of his codefendants." (quoting *United States v. Martinez–Molina*, 64 F.3d 719, 735 (1st Cir. 1995)).

### C. None of LaRoche's Purported Failures Affected the Trial's Outcome.

The district court further erred as a matter of law by failing substantively to consider what prejudicial effect, if any, LaRoche's deficiencies had on the trial in light of the overwhelming evidence of Baptiste's guilt and Boncy's complementary

38

defense. The district court found only that, but for those deficiencies, LaRoche might have been more successful in crafting a defense. But the fact that reviewing discovery, conducting an investigation, and preparing for trial "might" enable one to mount a more effective defense is the reason that failing to do so generally constitutes deficient performance. A finding of prejudice demands more, in the form of a conclusion that specific materials, witnesses, or avenues for cross-examination would likely have made a difference if only they had been pursued. By failing to reach any such conclusion, the district court effectively ordered a new trial on the basis of deficient performance alone.

Had the district court undertaken the prejudice analysis required by *Strickland*, it necessarily would have found LaRoche's deficiencies to be harmless. The district court's concern that LaRoche "potentially failed to identify exculpatory material or material that would have supported any potential defenses" was and remains purely hypothetical: neither Baptiste's new counsel nor the district court identified any such material. *Cf. Theodore*, 468 F.3d at 58 (observing that the absence of "an adequate description of the precise evidence that [the defendant] would present if a retrial were ordered" precluded undertaking a prejudice analysis on appeal). That includes "potential mistranslations or words capable of multiple meanings" that the district court surmised might have been found had LaRoche hired

39

a translator to translate the audio and video recordings—recordings in which Boncy's highly competent counsel failed to find any exculpatory evidence.

The district court's concern with witnesses LaRoche did not interview or call is also academic.   Baptiste argued that LaRoche should have interviewed government witnesses, perhaps to impeach them, but the government agents' interactions with the defendants were recorded and unalterable. *See Stephens*, 294 F.3d at 218 (noting that where the relevant error is a failure to impeach a government witness, the court must consider the potential value of impeachment evidence in undermining the credibility of the witness's testimony).   Baptiste also argued that LaRoche should have called witnesses to show that Baptiste did not need to offer bribes given his personal network and the absence any requirement of government approval for private development projects, but evidence that Baptiste did not *need* to offer bribes could not undermine his similarly recorded and unalterable statements showing that he agreed to do just that. *See Mohammed*, 863 F.3d at 892 (finding no prejudice as to one count of conviction despite a complete failure to investigate because recordings of the defendant spoke for themselves and were not subject to impeachment).   Likewise, testimony from a Haitian law expert regarding the legality of political contributions by corporate entities and paid consultancies for former government officials would not have addressed the issue of whether any purported campaign contributions or consultancies were actually bribe payments or overt acts

40

in furtherance of the FCPA conspiracy. *See United States v. Silvia*, No. CR 14-10082-GAO, 2018 WL 10704411, at *5-6 (D. Mass. Apr. 23, 2018) (finding no ineffectiveness in failing to call an expert where the proposed expert testimony would not have advanced the defense), *aff'd*, 953 F.3d 139 (1st Cir. 2020). There is therefore no basis for believing that Haitian law bears on the elements of the charged conspiracy to violate U.S. law—and the district court did not find that it did.

Finally, testimony concerning annual bonuses paid by Haitian employers would have added little to Baptiste's explanation of the photographs of cash he sent to Anderson, which were in any event but a minor part of the government's overall case. Baptiste argued, and the district court agreed, that LaRoche should have sooner understood the photographs' significance. There is no suggestion, however, that LaRoche could have successfully excluded the photographs at trial. While Baptiste argued that an expert in Haitian business practices and a fact witness with knowledge of Baptiste's Haitian dental clinic could have supported LaRoche's closing-argument suggestion that the more plausible interpretation of the photographs was that the money was used to pay Christmas bonuses for dental clinic staff rather than to pay bribes, the features of the photographs on which Baptiste's argument relied—female names on envelopes and bills in denominations as low as $5—do not appear in the photographs sent to Anderson, [*compare* JA.2103 (photographs sent to Anderson), *with* JA.2313, 2315 (other photographs of cash retrieved from Baptiste's

41

phone)], and those features also largely speak for themselves, [*see* JA.1193-1194 (closing argument urging the jurors to analyze the photographs)]. And regardless, the interpretation Baptiste says LaRoche should have more thoroughly advanced would have done nothing to undermine the evidence of Baptiste and Boncy's agreement to offer bribes in the form of consultancies and large quantity cash payments funded by the 5% of total investment that SEW had not yet paid. *See Dugas*, 428 F.3d at 335, 339-40 (analyzing the strength of other evidence with which the defendant would have to contend even if he were successful in undermining some). The district court failed to engage in this analysis, determining that LaRoche should have been better prepared to discuss the photographs and other evidence at trial without explaining how such preparation reasonably could have affected the trial's outcome.

The district court's reliance on the doctrine of cumulative error does not excuse this failure. Although this Court has reasoned "'*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced,'" *Dugas*, 428 F.3d at 335 (quoting *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989)), the cumulative error doctrine establishes only that there need not be any singularly dispositive deficiency. *See United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993) ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating

42

effect."). It does not relieve the district court of its obligation to identify concrete ways in which correction of counsel's deficiencies would contribute to a substantial likelihood of a different result. Where—as here—none would, the cumulative error doctrine does not apply. *See, e.g.*, *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007) (explaining that "the cumulative error doctrine finds no foothold" if no individual trial error "worked any cognizable harm" to a defendant's rights). And even if it did, any cumulative impact of LaRoche's errors would remain insufficient to call the amply-supported verdict into doubt.

Because the district court failed to conduct a proper *Strickland* prejudice inquiry, its order granting Baptiste a new trial based on the purported ineffective assistance of his trial counsel must be vacated. *See Theodore*, 468 F.3d at 56 (vacating grant of new trial where district court presumed prejudice under *United States v. Cronic*, 466 U.S. 648, 659 (1984), rather than evaluating prejudice under *Strickland*); *see also United States v. Wilkerson*, 251 F.3d 273, 279 (1st Cir. 2001) (rejecting district court's reliance on concerns about effectiveness of counsel to support its grant of a new trial where court "did not hold an evidentiary hearing and did not make a finding of ineffective assistance of counsel pursuant to the *Strickland* test"). Furthermore, the result of the proper inquiry is clear. Baptiste's conviction rested on his own highly incriminating recorded statements, and there is no likelihood, much less a substantial one, that the result of the proceeding would have

43

been different but for LaRoche's deficiencies. *See Harrington*, 562 U.S. at 112. The jury verdict should accordingly be reinstated. *Cf. Wilkerson*, 251 F.3d at 275 (remanding for reinstatement of jury verdict where erroneous exclusion of evidence was "unmistakably harmless"); *United States v. Glantz*, 810 F.2d 316, 324 (1st Cir. 1987) (same, where review of the record left Court "convinced that no significant error attended defendants' convictions").

## III.    The District Court Erred as a Matter of Law by Finding Derivative Prejudice to Boncy.

The district court's granting of Boncy's new trial motion suffers from the same defects as its granting of Baptiste's: the district court's prejudice analysis failed to consider the strength of the government's evidence, the defense skillfully presented by Boncy's counsel, and the minimal to non-existent value of the evidence or avenues for cross-examination unexplored by LaRoche. But the court's decision to grant Boncy a new trial also suffers from an even more fundamental flaw. Boncy's claim of entitlement to a new trial is based on the alleged ineffective assistance rendered by Baptiste's counsel—not that of his own. The district court's acceptance of this claim runs counter to precedent of the Supreme Court, this Court, and others, which have repeatedly held that the Sixth Amendment right to counsel is personal and cannot be asserted vicariously. *See, e.g.*, *Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001) ("The Sixth Amendment right to counsel is personal to the defendant and specific to the offense"); *Gannett Co. v. DePasquale*, 443 U.S. 368,

44

379-80 (1979) ("'[T]he specific guarantees of the Sixth Amendment are personal to the accused.'" (quoting *Faretta v. California*, 422 U.S. 806, 848 (1975) (Blackmun, J., dissenting))); *Sabatino*, 943 F.2d at 96 n.1 (same); *United States v. Straker*, 800 F.3d 570, 619 n.18 (D.C. Cir. 2015) (same); *United States v. Davis*, 612 F. App'x 526, 527-28 (10th Cir. 2015) (unpublished) (same); *United States v. Johnson*, 267 F.3d 376, 380 (5th Cir. 2001) (same); *United States v. Sims*, 845 F.2d 1564, 1568 (11th Cir. 1988) (same); *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir. 1979) (same).

Neither the district court nor Boncy identified any case in any jurisdiction supporting the district court's reasoning. And as the government noted below, it is aware of none. [D.249 at 18-19 (citing *Garcia v. Lewis*, No. CV 13-5037-ODW (SP), 2015 WL 5461530, at *5 (C.D. Cal. June 23, 2015) (noting no legal support for the view that a defendant has standing to raise an ineffective assistance claim based on the performance of co-defendant's counsel); *Lao v. Virga*, No. 2:08-cv-3171-MCE TJB, 2011 WL 5101982, at *13 (E.D. Cal. Oct. 26, 2011) (same); *Brewer v. Cunningham*, No. 13 Civ. 2873, 2018 WL 6705707, at *16 (S.D.N.Y. Feb. 8, 2018) (same))].

In fact, this Court has expressly considered and rejected the precise argument that Boncy raises here. *See Sabatino*, 943 F.2d at 96 n. 1. In *Sabatino*, this Court considered the appeals of a husband and wife who were jointly tried and convicted

45

of conspiracy to violate the Mann Act, as well as other offenses. *See id*. at 95. Among the claims raised by the wife was that "she was prejudiced from the incompetent performance of her husband's trial counsel in eliciting particular portions of the government witnesses' plea agreements." *Id*. at 96 n.1. The Court rejected the claim out of hand on the ground that "Sixth Amendment[] rights . . . are personal in nature and cannot be asserted vicariously, even by a co-conspirator spouse." *Id*. (citing *Gannett*, 443 U.S. at 380); *accord United States v. Recendiz*, 557 F.3d 511, 522 (7th Cir. 2009) ("[A defendant], of course, cannot bring an ineffective assistance claim based upon the conduct of another co-defendant's attorney."); *United States v. Rondon*, 204 F.3d 376, 379 n.2 (2d Cir. 2000) (rejecting a defendant's claim of "spillover prejudice" from ineffectiveness of the attorney for his brother co-defendant, reasoning that "[i]t is well established . . . that a defendant lacks standing to challenge the effectiveness of his codefendant's trial counsel" (citing *United States v. Guanti*, 421 F.2d 792, 799 (2d Cir. 1970))). This holding forecloses Boncy's vicarious ineffective assistance claim.

Even if this Court were to construe Boncy's claim as an argument that he was prejudiced by joinder of the trials due to the presentation of conflicting defense strategies, as it and other courts have occasionally done, that contention would also fail. *See United States v. Davis*, 623 F.2d 188, 194-95 (1st Cir. 1980) (analyzing a defendant's argument that he suffered prejudice based on the ineffective assistance

46

of a co-defendant's counsel as raising a claim that the district court should have severed the trials due to conflicting defense strategies); *United States v. Arango*, 1993 WL 482917, at *1-2 (10th Cir. Nov. 22, 1993) (unpublished) (analyzing a similar argument by analogizing to *United States v. Garrett*, 961 F.2d 743, 746 n.5 (8th Cir. 1992), in which the court affirmed the denial of a motion for a mistrial or severance over the defendant's objection that he suffered prejudice based on the "unorthodox actions" of his co-defendant's counsel). Severance on the ground of conflicting defenses requires a conflict "so prejudicial that defenses are irreconcilable," *Davis*, 623 F.2d at 194-95, such as when "the antagonism [is] such that if the jury believes one defense, it is *compelled* to convict the other defendant," *United States v. Floyd*, 740 F.3d 22, 36 (1st Cir. 2014) (quotation marks omitted); *see also Tiem Trinh*, 665 F.3d at 18. The district court found no such prejudice here. To the contrary, the court concluded at trial that the defenses were not irreconcilable and reaffirmed that conclusion when holding that Baptiste and Boncy should be retried together.

Nor is the prejudice the district court did find sufficient under any rubric to warrant the unprecedented relief it granted. The court's conclusion that "Boncy's trial strategy was distorted as a result of LaRoche's ineffective assistance" lacks any

47

factual basis; the court received no evidence on this issue,[13] and the record demonstrates that the strategy Boncy's counsel executed at trial was the same one outlined in his trial brief and previewed at a pre-trial evidentiary hearing. [*See* D.150 at 1 (trial brief arguing that "[w]hat the evidence will show is that Baptiste ran a scam in the FBI, stole their money, and lied to everyone that came in his orbit— including Boncy—about the real nature of his intentions"); D.216 at 20-36, 49-50, 117-124 (evidentiary hearing questioning about Boncy's lack of involvement in the Nov. 12, 2015 side conversation with Baptiste, the "Charitable Contribution" callout in the draft joint venture agreement sent by Boncy, the "different answer" about the 5% given by Boncy during the unavailable calls, and Baptiste's transfer of the $50,000 to a personal account)]. The court's "distortion" finding thus rested entirely on its speculative conclusion that Boncy's counsel might have opted to take on a lesser role and might have been able to develop more fully his defense if LaRoche had more competently defended Baptiste. But Boncy's counsel's role was no different than the one he might have played in a trial of Boncy alone, and Boncy was

---

[13] In the only line of questioning pursued by Boncy's counsel at the evidentiary hearing on the defendants' new trial motions, he elicited agreement from Jason Hinton that, following a meeting between the defense teams at which an unspecified transcript was reviewed, Boncy's counsel "began to refer . . . to theft of money, lying, fraud." [JA.2837-2840]. The district court disagreed with the government's contention that Boncy's counsel had thereby put a change in his defense strategy at issue and denied further inquiry. [*See* JA.2842].

not entitled to be tried alongside a co-defendant whose defense bolstered his own. And regardless, "speculation cannot replace actuality."  *Guanti*, 421 F.2d at 799 (rejecting claim that the defendant was prejudiced by the allegedly inadequate representation of his co-defendant brother where the defendant was "represented by his own counsel who had every opportunity to examine and cross-examine the witnesses"); *accord Arango*, 1993 WL 482917, at *1-2 (rejecting claim that the defendant was prejudiced by the allegedly inadequate representation of his co-defendant sister where "only surmise" supported the contention).  The district court therefore unjustifiably jettisoned the jury's verdict.  In doing so, moreover, the court created an unworkable standard for multi-defendant cases, which can—and often do—involve lawyers of differing abilities who present a range of defenses.

The district court's finding of derivative prejudice to Boncy based on the deficient performance of his co-defendant's counsel was both contrary to this Court's precedent and lacking in record support and must be reversed.

49

## CONCLUSION

For these reasons, the government respectfully requests that this Court vacate the district court's ordering granting the defendants new trials and remand with instructions to reinstate the jury verdicts.

Respectfully submitted,

BRIAN C. RABBITT
Acting Assistant Attorney General

ANDREW E. LELLING
United States Attorney

ROBERT A. ZINK
Acting Deputy Assistant Attorney General

By: /s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney

JEREMY R. SANDERS
Appellate Counsel
Fraud Section, Criminal Division
U.S. Department of Justice

## CERTIFICATE OF COMPLIANCE WITH
### Rule 32(a)

### Certificate of Compliance with Type-Volume Limit,
### Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,017 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2016.


/s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney

Dated:  September 18, 2020

51

## CERTIFICATE OF SERVICE

I, Alexia R. De Vincentis, Assistant U.S. Attorney, hereby certify that on September 18, 2020, I electronically served a copy of the foregoing document on the following registered participants of the CM/ECF system:

*Counsel for Defendant-Appellee Joseph Baptiste*
William W. Fick, Esq.
Daniel N. Marx, Esq.
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA 02110

*Counsel for Defendant-Appellee Roger Richard Boncy*
Mark A. Berthiaume, Esq.
Jared E. Dwyer, Esq.
Stephanie Peral, Esq.
Jay Yagoda, Esq.
Greenberg Traurig LLP
333 SE 2nd Ave, Suite 4400
Miami, FL 33131

/s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney

52

Nos.  20-1400, 20-1401

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

_____

**No. 20-1400**

UNITED STATES OF AMERICA,
**Appellee**

v.

JOSEPH BAPTISTE,
**Defendant-Appellant**

_____

**No. 20-1401**

UNITED STATES OF AMERICA,
APPELLANT

v.

ROGER RICHARD BONCY,
DEFENDANT-APPELLEE

_____

## Addendum Table of Contents

1.    Memorandum and Order on Defendants' Motions for Judgment of Acquittal and for a New Trial (D.286) ...........................................................G.Add.001

2.    Notice of Appeal (D.293) ..............................................................G.Add.017

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,            ∗
                                      ∗
            v.                        ∗
                                      ∗
JOSEPH BAPTISTE and                   ∗     Criminal Action No. 17-cr-10305-ADB
ROGER RICHARD BONCY,                  ∗
                                      ∗
            Defendants.               ∗
                                      ∗

**MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL**

BURROUGHS, D.J.

On October 30, 2018, a grand jury returned a superseding indictment against Joseph

Baptiste and Roger Richard Boncy charging them with conspiring to violate the Travel Act and

the Foreign Corrupt Practices Act ("FCPA"), conspiring to commit money laundering, and

violating the Travel Act based on their efforts to bribe Haitian officials to promote a port

development project in Môle Saint Nicolas, Haiti. [ECF No. 74]. After an eight-day trial, on

June 20, 2019, a jury convicted Defendants Baptiste and Boncy (collectively, "Defendants") of

conspiring to violate the FCPA, 15 U.S.C. § 78dd-2, and the Travel Act, 18 U.S.C. § 1952.

[ECF No. 199]. The jury also convicted Defendant Baptiste of a substantive violation of the

Travel Act and conspiring to commit money laundering in violation of 18 U.S.C. § 1956(h).

[Id.].

Currently pending before the Court is Defendant Baptiste's motion for a new trial on the

basis of ineffective assistance of counsel. [ECF No. 234]. Also pending before the Court are

Defendants' motions for judgment of acquittal, which were initially made following the close of

the Government's evidence and were renewed following trial. [ECF Nos. 232, 242]. For the

following reasons, Defendant Baptiste's motion for a new trial, [ECF No. 234], is <u>GRANTED</u>

and Defendant Boncy's motion for acquittal or, in the alternative, a new trial, [ECF No. 242], is

<u>GRANTED</u> in part and <u>DENIED</u> in part.  Defendant Baptiste's motion for acquittal, [ECF No.

232], is <u>DENIED</u>.

## I.    BACKGROUND

### A.    Procedural Background

On August 26, 2019, Defendant Baptiste filed motions for acquittal and a new trial, [ECF

Nos. 232, 234], and Defendant Boncy filed a motion for acquittal or, in the alternative, a new

trial, [ECF No. 242].  Defendant Baptiste's motion was supported by a five-page affidavit signed

by Jason Hinton, [ECF No. 239-1 ("Hinton Affidavit")], who attended much of the trial and

assisted trial counsel Donald LaRoche with aspects of the trial.  On September 30, 2019, the

Government filed its opposition to Defendant Baptiste's motion for acquittal and Defendant

Boncy's motion.  [ECF Nos. 248, 249].  On October 2, 2019, the Government filed its opposition

to Defendant Baptiste's motion for a new trial.  [ECF No. 251].  Defendant Boncy filed a reply

brief on October 25, 2019.  [ECF No. 254].

On November 6, 2019, the Court noticed an evidentiary hearing for November 13, 2019

on Defendant Baptiste's motion for a new trial.  [ECF No. 258].  The Court continued the

evidentiary hearing due to a scheduling conflict for LaRoche, who was expected to testify, and to

have time to resolve discovery disputes between the parties.  [ECF No. 259 ¶¶ 4, 6; ECF Nos.

258, 260].  On November 13, 2019, the Court held a status conference to discuss potential waiver

of attorney-client privilege in connection with Defendant Baptiste's motion and the upcoming

evidentiary hearing.  [ECF No. 262].  The Government later filed a motion for clarification of the

Court's November 13, 2019 rulings at the status conference, [ECF No. 266], and Defendant

Baptiste opposed the motion, [ECF No. 269].  On December 16, 2019, the Court held a hearing on the privilege issue and stated that it would not find that Baptiste had entirely waived attorney-client privilege based solely on his raising an ineffective assistance of counsel claim.  [12/16/19 Tr. at 4:12–18].  Instead, the Court determined that it would review and make determinations about waiver based on responses from witnesses at the evidentiary hearing.  [Id. at 38:9–14, 39:8–13].

The evidentiary hearing was held over the course of two days, January 14, 2020 and February 5, 2020.  [ECF Nos. 278, 285].  Trial counsel LaRoche testified on January 14, 2020.  [ECF No. 278].  Husband and wife Jason and Arielle Hinton, who are friends of Defendant Baptiste and attorneys practicing in the State of Maryland, testified on February 5, 2020.  [ECF No. 285].  All parties had an opportunity to fully cross-examine witnesses.

## II.    LEGAL STANDARD

### A.    Rule 29 Standard

To prevail on a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt."  United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018) (citing United States v. Gabriele, 63 F.3d 61, 67 (1st Cir. 1995)).  The Court does not "weigh the evidence or make any credibility judgments, as those are left to the jury."  United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010) (citing United States v. Ayala-Garcia, 574 F.3d 5, 11 (1st Cir. 2009)).  Instead, the Court "resolve[s] all credibility disputes in the verdict's favor," id. (quoting United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995)), and "examine[s] the evidence—direct and circumstantial—as well as all plausible inferences drawn therefrom, in the

light most favorable to the verdict," <u>United States v. Meléndez-González</u>, 892 F.3d 9, 17 (1st Cir. 2018) (internal quotations omitted).

### B.    Rule 33 Standard

On a motion for a new trial under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[T]he remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice and where the evidence preponderates heavily against the verdict."  <u>Merlino</u>, 592 F.3d at 32 (quoting <u>United States v. Wilkerson</u>, 251 F.3d 273, 278 (1st Cir. 2001)).  "The trial court may set aside a verdict and order a new trial if, in its opinion, the verdict is against the clear weight of the evidence, is based upon evidence that is false, or resulted from some trial error and amounts to a clear miscarriage of justice."  <u>Payton v. Abbott Labs</u>, 780 F.2d 147, 152 (1st Cir. 1985).  "[A] district court has greater latitude in considering a motion for a new trial than it does in considering a motion for acquittal . . . ."  <u>Merlino</u>, 592 F.3d at 33.

### C.    Ineffective Assistance of Counsel Standard

The Sixth Amendment guarantee of a "right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process." <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986).  "[T]he right to counsel is the right to the effective assistance of counsel."  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984) (quoting <u>McMann v. Richardson</u>, 397 U.S. 759, 771, n.14 (1970)).  "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." <u>Kimmelman</u>, 477 U.S. at 374.

When a defendant challenges his conviction on the basis of ineffective assistance of counsel, courts "first determine whether counsel's representation fell below an objective standard of reasonableness. Then [they] ask whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hinton v. Alabama, 571 U.S. 263, 272 (2014) (internal quotation marks omitted) (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). "A court may consider either prong first in the interest of efficiency." United States v. Sihai Cheng, 392 F. Supp. 3d 141, 153 (D. Mass. 2019) (citing Ortiz-Graulau v. United States, 756 F.3d 12, 17 (1st Cir. 2014)). "[F]ailure to satisfy one prong . . . obviates the need for a court to consider the remaining prong." Tevlin v. Spencer, 621 F.3d 59, 66 (1st Cir. 2010).

## III. DISCUSSION

### A. Baptiste's Motion for a New Trial

Defendant Baptiste seeks a new trial on the basis of ineffective assistance of counsel, citing nine errors made by trial counsel LaRoche: (1) failing to conduct an adequate investigation; (2) failing to review critical discovery; (3) failing to consult with potential experts; (4) misunderstanding the Court's pre-trial rulings concerning prosecution's evidence; (5) conducting self-defeating cross-examination or no cross-examination; (6) failing to object to improper lay opinion testimony; (7) failing to move for severance; (8) failing to request appropriate jury instructions; and (9) failing to present any coherent defense. [ECF No. 239]. The grounds supporting these allegations were detailed in the Hinton Affidavit. See [Hinton Affidavit]. The Government opposes the motion, arguing that LaRoche's performance was objectively reasonable and that, even if it was not, Defendant Baptiste cannot show a reasonable

probability that the result of the trial would have been different absent LaRoche's errors.  [ECF No. 251].

### 1.    Reasonableness of LaRoche's Performance

"To establish that counsel's performance was deficient, a defendant must show that it fell below an objective standard of reasonableness under the circumstances."  Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (citing Strickland, 466 U.S. at 687–88).  This prong "is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Hinton, 571 U.S. at 273 (internal quotation marks omitted) (quoting Padilla, 559 U.S. at 366).  When reviewing an ineffective assistance of counsel claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."  Strickland, 466 U.S. at 689.  "[A] reviewing court must not lean too heavily on hindsight: a lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented."  Ouber v. Guarino, 293 F.3d 19, 25 (1st Cir. 2002) (citing Bell v. Cone, 535 U.S. 685, 698 (2002)).  In addition, counsel's errors should be evaluated "in light of all the circumstances" and in the context of his or her "overall performance."  Kimmelman, 477 U.S. at 381, 386.

At the evidentiary hearing on January 14, 2020, LaRoche acknowledged that Defendant Baptiste's trial was his "first actual full-blown trial."  [1/14/20 Tr. at 26:5].  He was the only attorney of record for Defendant Baptiste, though Mr. Hinton sat at the defense table during several days of trial.  [Id. at 27:13–15, 119:19–24; ECF No. 285 (Hinton testimony regarding presence at trial)].  Mr. and Mrs. Hinton[1] communicated with LaRoche and Defendant Baptiste

---

[1] Mrs. Hinton is a criminal trial attorney with the Maryland State's Attorney's Office.  See [ECF No. 285].

prior to trial to discuss the case. [1/14/20 Tr. at 27:7–10, 28:18–20]. Mr. Hinton, however, is not a criminal trial attorney; he testified that he had no criminal experience and that his work with the Maryland State's Attorney's Office was limited to bond hearings. [ECF No. 285]. Mr. Hinton assisted LaRoche in drafting the opening statement and ultimately drafted the bulk of LaRoche's closing statement. [1/14/20 Tr. at 120:3–4; ECF No. 285 (Hinton testimony regarding assistance with opening and closing statements)]. LaRoche was otherwise responsible for engaging in discovery, investigation, and defense of Defendant Baptiste leading up to and throughout trial. The job of defending Defendant Baptiste was LaRoche's. Mr. Hinton began to take a more active role only because he lost confidence in LaRoche's abilities, including his ability to write competent opening and closing statements. [ECF No. 285].

LaRoche acknowledged that he was unable to open discovery produced by the Government, and this was supported by several e-mail communications in which he asked the Government to resend or assist in his efforts to open files. [1/14/20 Tr. at 30:1–11, 33:6–12]. LaRoche did not provide copies of documents or audio and video recordings to Defendant Baptiste, nor did they ever sit down together to review all of the materials that the Government had provided. [Id. at 31:9–32:15]. In fact, LaRoche said he could not state with certainty whether he ever reviewed all of the audio and video recordings the Government had provided, or whether he heard certain recordings for the first time at trial. [Id. at 34:12–13, 36:25–37:3]. The Government acknowledges that "[a]lmost all of the evidence against Baptiste" came from "video, . . . phone recordings and call transcripts" and Baptiste's own communications, and that "[t]he jury heard or reviewed transcripts from phone call after phone call" during trial. [ECF No. 251 at 5]. Many of these recordings were in Haitian Creole, which LaRoche understands. [1/14/20 Tr. at 34:7–11].

As for documents, LaRoche testified that he "had not had a chance to thoroughly review" certain documents. [1/14/20 Tr. at 37:4–16]. When the Government gave LaRoche a thumb drive with its proposed trial exhibits a month or less before trial, LaRoche testified that he had not seen some of the materials before. [Id. at 38:2–12, 47:6–11 ("Q. But to the extent if the government didn't identify it as an exhibit, had you been able to review it, listen to it previously? A. Not fully."), 47:25–48:4, 48:12–16 ("Q. And so is it fair—am I understanding correctly, if it wasn't included in the Government's immediate pretrial disclosures, you can't say for sure you managed to open it and review it?  A. That would be fair to say.")]. The trial exhibits were, LaRoche conceded, a small subset of the discovery the Government had produced since 2017. [Id. at 48:5–16].

LaRoche admitted that he had not investigated sufficiently to understand the import of a photograph that he saw for the first time one week before trial and which he thought "was not as critical as the government was able to argue it in front of the jury." [1/14/20 Tr. at 37:4–16] see also [id. at 50:12–25]. He said he did not realize until "later on" that the photograph was taken from Defendant Baptiste's own phone, but had assumed instead that the photograph was not tied to Defendant Baptiste because he did not appear in the photograph. [Id. at 37:11–23]. The following exchange from a status conference that took place just before opening arguments on June 11, 2019, is instructive in light of LaRoche's recent admissions:

> MR. LaROCHE: "They said it was connected to a text message, but I haven't been able to find that specific text message . . . ."

> MS. RUBIN-SMITH: "Your Honor, this was all produced in discovery several times. . . . We also handed over a report from the undercover's phone, and that report showed text messages and photos received from Baptiste's phone. And that picture is also on that report. . . . it's been handed over at least three times in three different ways."

[6/11/19 Tr. at 4:25–6:8].

Although the Government provided LaRoche with transcripts of some of the audio and video recordings that were in Haitian Creole, LaRoche testified that the majority were not produced with transcripts and he did not have transcripts made. [1/14/20 Tr. at 39:2–8]. This is in spite of the fact that Mr. Hinton identified potential errors in one of the Government's translated transcripts. See [BAP000960 (email from Hinton to LaRoche, discussing potential inaccuracies)]. In at least one instance, LaRoche reviewed, for the first time and just weeks before trial, a transcript provided by the Government but did not listen to the actual recording until the Government presented it at trial. [1/14/20 Tr. at 39:25–40:17]. He confirmed that he did not talk to Defendant Baptiste about this particular recording or transcript at any time prior to this, despite the fact that the Government began producing materials to LaRoche in 2017. See [Id. at 44:8–16].

LaRoche did not subpoena any witnesses. [1/14/20 Tr. at 59:15–16]. Defendant Baptiste and Mr. Hinton provided him with a list of categories of potential witnesses that could testify on Defendant Baptiste's behalf at trial. [ECF No. 285 (Hinton testimony)]. LaRoche, however, testified that he only made contact with one of those potential witnesses, [1/14/20 Tr. at 59:17–24], and did not attempt to formulate his own list of potential witnesses in support of Defendant Baptiste's potential defenses against the charges, [id. at 52:14–19, 53:6–54:1, 57:24–58:4]. In addition, LaRoche testified that he did not attempt to identify or contact any expert witnesses that could have provided evidence on Haitian law or business practices. [Id. at 59:25–60:4].

Once trial began, LaRoche's lack of preparation impeded his ability to diligently defend his client. During his opening statement, which Mr. Hinton helped draft, LaRoche continued to pursue an entrapment defense although he testified at the hearing on the currently pending motions that others had previously told him that the defense was not available to Defendant

Baptiste on the facts of the case. [1/14/20 Tr. at 74:18–75:10, 98:1–14, 99:8–16]. As for his

closing statement, both LaRoche and Mr. Hinton testified that Mr. Hinton drafted the statement

the night before LaRoche was due to present it. [Id. at 119:10–18; ECF No. 285 (Hinton

testimony)].

LaRoche only cross-examined two of the Government's six witnesses, none of whom

LaRoche had contacted or sought to interview prior to trial. [ECF No. 239 at 23; ECF No. 251 at

20–21].[2] Instead, he allowed counsel for Defendant Boncy, Jared Dwyer, to conduct cross-

examinations of the remaining witnesses and testified:

> [I]n my opinion there were instances where Mr. Dwyer was doing a great job in
> terms of what he was doing with the case, and I had some minimum conversation
> with Dr. Baptiste about that. And so I chose not to jump up and object under the
> impression, and basically what I was seeing, that Mr. Dwyer was already in that
> area, so I elected not to sort of beat the horse.

[1/14/20 Tr. at 116:13–25]. This was despite the fact that an aspect of Dwyer's trial strategy was

to portray Defendant Baptiste as the primary driver of the alleged conspiracy. See, e.g., [6/12/19

Tr. at 6:7–9:5, 18:5–23:12 (eliciting testimony on Defendant Baptiste), 46:14–47:12, 48:12–19,

49:5–11 (eliciting testimony to distinguish roles of each Defendant)].

The errors, omissions, and general lack of diligence outlined above demonstrate that

LaRoche failed to provide effective assistance to Defendant Baptiste. See Harrington v. Richter,

562 U.S. 86, 106 (2011) ("It can be assumed that in some cases counsel would be deemed

ineffective for failing to consult or rely on experts . . . ."); Kimmelman, 477 U.S. at 384–85

("[T]hat testing process generally will not function properly unless defense counsel has done

some investigation into the prosecution's case and into various defense strategies . . . . Viewing

counsel's failure to conduct any discovery from his perspective at the time he decided to forgo

---

[2] Defendant Baptiste notes that during cross-examination of Agents Anderson and Arlati,
LaRoche elicited damaging testimony and cites this as further evidence of LaRoche's lack of
preparation for trial. [ECF No. 239 at 24–27].

that stage of pretrial preparation . . . we find counsel's decision unreasonable, that is, contrary to prevailing professional norms."); United States v. Márquez-Pérez, 835 F.3d 153, 165 (1st Cir. 2016) ("[C]ounsel's neglecting to review the government's video evidence indicates deficient performance."); see also Fisher v. Gibson, 282 F.3d 1283, 1296 (10th Cir. 2002) ("A decision not to investigate cannot be deemed reasonable if it is uninformed.  [Counsel's] decision not to undertake substantial pretrial investigation and instead to 'investigate' the case *during* the trial was not only uninformed, it was patently unreasonable." (internal citation omitted)).

The Court cannot conclude that LaRoche's failure to review discovery or otherwise investigate his client's defenses "might be considered sound trial strategy," nor did LaRoche claim that these failures were part of a strategy.  See Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).  While he was not required to perform all of the numerous steps available to him to prepare for trial, the fact that he performed so few and in such a cursory manner is undeniably deficient.  LaRoche clearly was not making "strategic choices . . . after thorough investigation of law and facts . . . ."  Id. at 690.  His "complete lack of pre-trial preparation put[] at risk both the defendant's right to an 'ample opportunity to meet the case of the prosecution' and the reliability of the adversarial testing process."  Kimmelman, 477 U.S. at 385 (quoting Strickland, 466 U.S. at 685).

It is evident from LaRoche's testimony and the testimony and evidence presented at the evidentiary hearing that LaRoche's "overall performance" did not live up to "prevailing professional norms."  See Kimmelman, 477 U.S. at 386; Hinton, 571 U.S. at 273.  This conclusion is reinforced by the Court's own observations of LaRoche's trial performance.  The Court therefore finds that LaRoche's performance as Defendant Baptiste's counsel "fell below an objective standard of reasonableness under the circumstances."  Sleeper, 510 F.3d at 38.

2.    Prejudice to Defendant Baptiste

Where deficient performance is established, a defendant must also "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . ." Strickland, 466 U.S. at 694.  This inquiry is focused on "the fundamental fairness of the proceeding." Id. at 696.  "[I]t is not enough for [a defendant] 'to show that the errors had some conceivable effect on the outcome,' but he is also not required to 'prove that the errors were more likely than not to have affected the verdict.'" Rivera v. Thompson, 879 F.3d 7, 12 (1st Cir. 2018) (quoting González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001)).  Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.  In assessing prejudice, courts "must consider the totality of the evidence before the judge or jury." Id. at 695.

"Strickland clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced." Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005) (quoting Kubat v. Thieret, 867 F.2d 351, 370 (7th Cir. 1989)); see also Rossetti v. United States, 773 F.3d 322, 331 (1st Cir. 2014) (discussing the cumulative effect of errors related to ineffective assistance); Green v. Kenneway, 390 F. Supp. 3d 275, 298 (D. Mass. 2019) (citing United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)) (discussing potential for cumulative impact of errors related to ineffective assistance).  In considering the cumulative effect of errors, the First Circuit has held that "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect." United States v. Delgado-Marrero, 744 F.3d 167, 210 (1st Cir. 2014) (quoting Sepulveda, 15 F.3d at 1195–96 (alteration in original)).

The Court finds that LaRoche's failure to meaningfully review discovery produced by the Government until the days leading to trial was prejudicial to Defendant Baptiste in that it significantly impeded LaRoche's ability to prepare for trial. In addition, while certain errors identified supra may not have been prejudicial in isolation, the cumulative effect of LaRoche's failure to meaningfully review discovery in combination with the other errors identified herein raises a "reasonable probability" that Defendant Baptiste was prejudiced by the deficiency. See Strickland, 466 U.S. at 694.

For example, by failing to review the discovery provided by the Government—in the form of documents, audio and video recordings, and transcripts of those recordings—prior to trial, LaRoche potentially failed to identify exculpatory material or material that would have supported any potential defenses. Reviewing these materials ahead of trial would also have assisted LaRoche by informing him as to the Government's strongest evidence against his client, allowing him to prepare to discuss the evidence at trial. Further, if he had identified or interviewed potential witnesses or interviewed the Government's witnesses, or if he had identified and retained experts to testify to Haitian law or business practices, he might have presented a colorable defense for his client. Such a defense would include effective cross-examination of the Government's witnesses. Lastly, had LaRoche hired a translator to translate the audio and video recordings that were so central to the Government's case, he might have been able to challenge any potential mistranslations or words capable of multiple meanings in either English or Haitian.

Accordingly, because Defendant Baptiste has demonstrated that LaRoche's conduct fell below an objective standard of reasonableness and that, taken cumulatively, LaRoche's errors prejudiced him to such a degree that his conduct has "undermine[d] confidence in the outcome"

of his trial, Defendant Baptiste's motion for a new trial, [ECF No. 234], is GRANTED. See

Strickland, 466 U.S. at 694.

### B.    Boncy's Motion for a New Trial

Defendant Boncy seeks a new trial as a result of prejudice he experienced due to

LaRoche's ineffective assistance to Defendant Baptiste. [ECF No. 242 at 24]. Specifically,

Boncy seeks a new, separate trial as to Count I. [Id.]. Defendant Boncy notes that he was

required to cross examine the majority of the Government's witnesses, [ECF No. 254 at 10], and

the Government acknowledges that counsel for Boncy "effectively led the defense side of the

case" after the first witness. [ECF No. 249 at 19].

The Court also orders a new trial for Defendant Boncy. In the Court's view, a new trial is

warranted as to Defendant Boncy because LaRoche's deficient representation resulted in

Defendant Boncy's counsel having to play an outsized role at trial rather than pursue his

preferred defense strategy for his own client. As examples, LaRoche acknowledged that he

"lean[ed] on [Dwyer's] objections" because he "didn't want to fumble through it and make

matters worse." [1/14/20 Tr. at 67:24–25, 68:12–15]. Yet LaRoche also acknowledged that he

and Dwyer did not "coordinate" their defense strategy or see "eye to eye" because "Dwyer had

his direction and I had mine in terms of how we were proceeding with the trial." [Id. at 115:18–

20, 117:16–18]. Given that Defendant Boncy played a different role in the charged conspiracy

than Defendant Baptiste, his counsel might well have decided to say and do considerably less

during trial to emphasize his client's more minor participation in the alleged conspiracy had he

not had to carry the defense so much on his own. Also, had LaRoche more competently

defended Defendant Baptiste, then Dwyer might have been able to more fully develop a defense

based on a failure to establish the meeting of the minds necessary to prove a conspiracy (i.e. one

defendant intended an FCPA violation while the other one intended to steal funds from the co-defendant or the undercover agents). In any event, it is the Court's view that Defendant Boncy's trial strategy was distorted as a result of LaRoche's ineffective representation.

With regard to severance, where the Government has charged a conspiracy and the Court has determined that severance is not warranted, Defendants Baptiste and Boncy should be re-tried together. Cf. United States v. Floyd, 740 F.3d 22, 36 (1st Cir. 2014) ("[T]he severance of coconspirators' trials 'will rarely, if ever, be required.'") (quoting United States v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995))); United States v. Saunders, 553 F.3d 81, 85 (1st Cir. 2009) ("The preference for a joint trial is particularly strong where the charge is conspiracy."). Defendant Boncy's motion for new trial, [ECF No. 242], is thus GRANTED in part and DENIED in part.

### C.    Baptiste and Boncy's Motions for Acquittal

In light of LaRoche's performance, the Court cannot meaningfully undertake an analysis of the sufficiency of the evidence under Rule 29. See Acevedo, 882 F.3d at 257 (to prevail on a Rule 29 motion, a defendant must "show that the evidence presented at trial, even when viewed in the light most favorable to the government, did not suffice to prove the elements of the offenses beyond a reasonable doubt"). Defendants' motions for Acquittal, [ECF Nos. 232, 242], are therefore DENIED.

## IV.    CONCLUSION

Although the Supreme Court has identified principles that should guide district courts in their analysis of ineffective assistance of counsel claims, the Supreme Court has made clear that "the principles we have stated do not establish mechanical rules." Strickland, 466 U.S. at 696. "In every case the court should be concerned with whether, despite the strong presumption of

reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Id. This Court recognizes just such a breakdown in the assistance LaRoche provided to Defendant Baptiste. Although the prejudice prong was a considerably closer call than the ineffectiveness prong of the analysis, the Court simply cannot conclude that Defendants received a fair trial. Although the Court does not fault the Government in arguing against a new trial and recognizes the burden of a second trial, at the end of the day the Court finds that justice and fairness require that the new trial motions be granted.

Accordingly, Defendant Baptiste's motion for a new trial, [ECF No. 234], is GRANTED, Defendant Baptiste's motion for acquittal, [ECF No. 232], is DENIED, and Defendant Boncy's motion for acquittal or new trial, [ECF No. 242], is GRANTED in part and DENIED in part. The Court will schedule a status conference with the parties to set a new trial date.

**SO ORDERED.**

March 11, 2020

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 17-10305-ADB** |
| | ) | |
| **JOSEPH BAPTISTE,** | ) | |
| **ROGER RICHARD BONCY,** | ) | |
| **Defendants.** | ) | |

## NOTICE OF APPEAL

Notice is hereby given that the United States of America (the prosecution in the above-captioned case) hereby appeals to the United States Court of Appeals for the First Circuit from the district court's (Burroughs, J.) March 11, 2020 *Memorandum and Order*, granting the defendants' motions for a new trial (entered on the docket March 11, 2020) (Doc. No. 286).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    /s/ Kriss Basil
       KRISS BASIL
       Assistant U.S. Attorney

       ROBERT A. ZINK
       Chief, Fraud Section

By:    /s/ Elina A. Rubin-Smith
       ELINA A. RUBIN-SMITH
       Trial Attorney

**G.Add.17**

Certificate of Service

I hereby certify that on April 6, 2020, this Notice of Appeal filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Kriss Basil
KRISS BASIL
Assistant U.S. Attorney